1
2
3
4
5

UNITED STATES DISTRICT COURT

6

NORTHERN DISTRICT OF CALIFORNIA

7

8    UNITED STATES OF AMERICA,                    Case No.  22-cr-00028-SI-1

9              Plaintiff,

10         v.                                      **ORDER DENYING DEFENDANT'S
                                                   MOTION TO SUPPRESS**
11    JAMES EARL TALLEY,
                                                   Re: Dkt. No. 22
12             Defendant.

13

14         On June 21, 2022, the Court held a hearing on defendant's motion to suppress.  For the

15    reasons set forth below, the Court DENIES the motion.  The Court also DENIES defendant's

16    request for an evidentiary hearing, as the Court finds that there are no material disputes of fact

17    relevant to the Court's resolution of the motion.

18

19                                          **BACKGROUND**

20         On November 14, 2021 at approximately 10:13 a.m.,[1] a man called 911 to report that there

21    was a man with a gun at the Civic Center Inn in San Francisco.  Blank Decl. Ex. A (911

22    recording).  The 911 caller said he was at "790 Ellis" Street, the address of Civic Center Inn, and

23    he told the dispatcher "this is the front desk" and "I want to be anonymous."  *Id*. at 0:07–0:11.

24    The caller reported that "there's a guy with a gun here, he's trying to get into the room" and said

25    the man was "on the second floor."  *Id*. at 0:12–0:18.  The caller described the man as "wearing

26    blue jeans, white shoes with a little Nike—a little black on them, and a black jacket, and a beanie,

27

28    _____
           [1]  Defendant's motion states that the call was received at 10:13 a.m.  Def's Mtn. at 1.

and a mask over his face." *Id*. at 0:20–0:34.  The dispatcher asked if the man was "white, black, Asian, or Hispanic," and the caller said "I can't tell because of the mask" and then that he "could be Latino." *Id*. at 0:34 – 0:41.  The caller said the man was "about 5'9" and that "he looks slim but the jacket makes him look a little bit bigger." *Id*. at 0:44–0:55.

When the dispatcher asked the 911 caller what type of gun he saw, the 911 caller said "I didn't, somebody else seen it.  He dropped it right here from his waistband and picked it back up." *Id*. 1:03–1:15.  The 911 caller said the gun was "a handgun" but could not offer any other details about it.  *Id*. at 1:16–1:28. When the dispatcher asked the 911 caller for more information about where the man currently was, such as "which room or which unit number," the 911 caller began speaking Spanish, seemingly to someone other than the dispatcher, and a woman can be heard answering in Spanish in the background of the recording.  *Id*. at 1:29–1:45.  The 911 caller then said to the dispatcher, "the housekeeping here [is] getting nervous" and said that the man was "still here in the same place. He's at 790 Ellis. He's on the second floor." *Id*. at 1:45–1:59. With the Spanish speaking woman audible in the background of the recording, the 911 caller then revised the description of the man's clothes, saying: "It's a black shirt. Oh the jeans are black—black jeans, black gloves, beanie, and white shoes." *Id*. at 2:00–2:14.  When the dispatcher asked the 911 caller to "have the staff direct [the officers] to him so they know who to look for," the 911 caller said "no, we're not going to meet them. We're not going to jeopardize our staff members." *Id*. at 2:16–2:26.  The 911 caller became frustrated with the dispatcher and said, "We're not going to jeopardize our staff and get hurt." *Id*. at 2:30–2:34.  The dispatcher told the 911 caller that officers were on their way and the call ended. *Id.* at 2:34–2:38.

In response to the 911 call, SFPD officers were immediately dispatched to the Civic Center Inn.  The officers received a computer-aided dispatch report stating "RP BEING ADVS BY STAFF THAT MALE ON 2ND FLR HAS A GUN IN HIS WAISTBAND OF PANTS . . . 221 – WML [white male Latino], 5'9, SLM BLD, BEANIE, BLK JKT, BLK SHIRT, BLK JEANS, WHI SHOES W/ BLCK NIKE LOGO."  Blank Decl., Ex. C (Officer Erb's Report).  According to the officers' reports, the first officers arrived at the Civic Center Inn at approximately 10:17 a.m. *Id*.

The Civic Center Inn is situated on the corner of Ellis Street and Polk Street, with the front of the inn accessible on Ellis Street and the back of the inn facing Olive Street, which is parallel to Ellis Street. The layout of the Civic Center Inn is similar to a motel, with rooms on the first floor adjacent to an outdoor parking area on Ellis Street, and the rooms on upper floors accessible by an outdoor walkway. At the back of the inn, facing Olive Street, there is another parking lot. The officers' body cam footage shows that when officers arrived at the inn on the Ellis Street side of the hotel, there was a man in the front parking lot wearing a black shirt, grey pants, dark shoes, and a black baseball cap. Blank Decl., Ex. D at 0:28-43 (Officer Conway's body cam footage). Several of the officers discussed whether he was the suspect and dismissed him, stating that the description was "all black, slim." Blank Decl., Ex. E at 1:04-1:06 (Officer Silvestri's body cam footage). The officers walked upstairs to the second level.

Almost immediately after arriving on the second floor, the officers were flagged down by a woman[2] standing in the hallway who told them "he is in the parking lot in the back" and who directed the officers to go down a hallway towards the parking lot at the back of the hotel, adjacent to Olive Street. Blank Decl., Ex. D at 1:18-1:31. Officer Conway responded, "In the back? With the cars?", and the woman responded, "Yes." *Id.* at 1:31-1:35. Officer Conway then said, "Not in the building. In the parking lot?", and the woman said, "Not right now, but he was opening the door." *Id.* at 1:37-1:41. Officer Conway asked what the man looked like, the woman responded by pointing down a hallway towards Olive Street and saying, "This, over there. In the parking lot." *Id.* at 1:41-1:45. Officer Conway pointed to a hotel room on the side of the hallway, and the woman responded, "No, in the parking lot." *Id.* at 1:47-1:49.

The officers proceeded down the hallway toward the Olive Street parking lot, while the woman stayed behind in the interior of the hallway. *Id.* at 1:49-1:57. Several officers then converged on the second-floor walkway overlooking the back parking lot and Olive Street. *Id.*

---

[2] The woman was later identified as a housekeeper at the Civic Center Inn, and she subsequently positively identified Talley as the man she had seen with a handgun earlier that morning. Blank Decl., Ex. C at US-000010.

United States District Court
Northern District of California

Officers saw one man standing on the second-floor walkway; he was Black,[3] wearing black shorts, a short-sleeved black tee-shirt, black socks with black sandals, and no head covering.  Blank Decl., Ex. E at 2:14:2:27.  Officers also saw a second man, later identified as Talley, in the ground floor parking lot below the officers.  *Id.* at 2:11.  Talley was in an empty parking space between two cars, and he was hunched over and rummaging through a black purse on the ground.[4]  *Id.* at 2:10-2:14.  Talley was wearing a long-sleeved hooded black sweatshirt, black pants, white shoes with a black logo, gloves, and a black balaclava that covered his face except for his eyes.  *Id.*  Talley is African-American, with a medium to dark complexion.[5]  *Id.*; Talley Decl. ¶ 2; Parker Decl., Ex. A-B (pictures of Talley).

Officers spoke the man on the second floor, and Sergeant Hopkins frisked him before telling him to go back in his room.  Blank Decl., Ex. E at 1:58-2:31.  Meanwhile, Officer Nguyen arrived at the inn after the other officers had, and he proceeded to the second floor walkway overlooking the back parking lot.  Officer Nguyen ran up to the second floor and encountered the same woman who had directed the other officers.  Blank Decl., Ex. G at 1:04-1:09 (Officer Nguyen's body cam footage).  The woman pointed down the hallway in the Olive Street direction and said, "There is a guy in the parking lot" and she mentioned "a car."  *Id.* at 1:07-1:13.  Sergeant Erb, who overheard Nguyen and the woman speaking, called out, "Which one, which one?"  *Id.*; Blank Decl., Ex. E at 2:06-2:08.  The officers asked for clarification, and the woman responded,

---

[3]   Defendant's motion describes this man as appearing to be a white Latino.  The government asserts, and the video footage supports, that this man was Black.

[4]   Talley states in his declaration that at the time, he was homeless and he "found a bag in the parking lot that morning, and I rummaged through it to see if there was anything in it that I could use or sell.  One thing I found right away was a handgun.  I took the handgun because I thought I could sell it to get money for food or shelter.  I did not take the handgun for any other reason."  Blank Decl., Ex. B, Talley Decl. ¶¶ 2-3.  Talley also states that there was "at least one other man in the parking lot, dressed in all black clothing like me, closer to Polk Street.  After the officers called out to me [from the balcony], the other man left the parking lot and walked north on Polk Street."  *Id.* ¶ 5.  Defendant's motion asserts that Talley's recollection is "consistent" with the video from Sergeant Erb's body-worn camera, citing that footage at 1:49-1:55.  In that portion of the video footage, an individual can be seen walking north on Polk Street, perpendicular to the parking lot, who appears to be wearing a long-sleeved black shirt or jacket, olive or khaki-colored pants, and dark shoes.  Blank Decl., Ex. F at 1:49-1:55.

[5]  According to the SFPD Incident Report, Talley is 5'10" and weighs 156 pounds.  Blank Decl. Ex. C.

"This guy in the parking lot."  Blank Decl., Ex. G at 1:13-1:23.  Officer Nguyen ran towards the officers and pointed to Mr. Talley, who was still crouched down in the parking lot, saying, "They're saying it was this guy."  *Id.* at 1:09-1:15.  Officer Nguyen again said, "They said it was this guy in the parking lot," and the woman called out from the interior hallway, "Yeah, yeah."  *Id.* at 1:24-30.

Officers Conway and Erb hopped over the second-floor walkway railing and climbed down the parking lot.  Blank Decl., Ex. C at US-000009, US-000013.  Officer Conway directed Talley to put his hands on his head and to face one of the cars in the parking lot.  Blank Decl., Ex. D at 2:03-2:24.  Conway grabbed Talley's wrists and held them behind his back, while Officer Erb frisked Talley.  *Id.* at 2:44-2:52.  Officer Erb found a loaded handgun with an extended magazine in Talley's front sweatshirt pocket.  The officers arrested Talley, and he was subsequently indicted for one count of violating 18 U.S.C. § 922(g)(1), Felon in Possession of a Firearm and Ammunition.

## LEGAL STANDARD

"The government bears the burden of proving that a warrantless search or seizure falls within an exception to the warrant requirement."  *United States v. Job*, 871 F.3d 852, 860 (9th Cir. 2017).

## DISCUSSION

Talley contends that the evidence discovered in the course of his arrest should be suppressed because officers did not have reasonable suspicion to detain and search him.  In *Terry v. Ohio*, 392 U.S. 1 (1968), the Supreme Court "held that the police can stop and briefly detain a person for investigative purposes if the officer has a reasonable suspicion supported by articulable facts that criminal activity 'may be afoot,' even if the officer lacks probable cause."  *United States v. Sokolow*, 490 U.S. 1, 7 (1989) (quoting *Terry*, 392 U.S. at 30).  "Although a mere 'hunch' does not create reasonable suspicion, the level of suspicion the standard requires is 'considerably less than proof of wrongdoing by a preponderance of the evidence,' and 'obviously less' than is

necessary for probable cause." *Navarette v. California*, 572 U.S. 393, 397, (2014) (internal citations omitted). "After stopping an individual based on reasonable suspicion, an officer may also conduct a limited pat down, or frisk, if he believes that 'the individual whose suspicious behavior he is investigating at close range is armed and presently dangerous.'" *Job*, 871 F.3d at 861 (quoting *Minnesota v. Dickerson*, 508 U.S. 366, 373 (1993)).

"While a tip such as the 911 call may generate reasonable suspicion, it can only do so when, under the 'totality-of-the-circumstances,' it possesses two features." *United States v. Vandergroen*, 964 F.3d 876, 879 (9th Cir. 2020) (quoting *United States v. Rowland*, 464 F.3d 899, 907 (9th Cir. 2006)). "First, the tip must exhibit sufficient indicia of reliability, and second, it must provide information on potential illegal activity serious enough to justify a stop." *Vandergroen*, 964 F.3d at 879.

Talley contends that the 911 tip did not contain sufficient indicia of reliability.[6]   The Supreme Court and the Ninth Circuit have identified the following factors that can demonstrate the reliability of a tip:  (1) "whether the tipper is known, rather than anonymous"; (2) "whether the tipper reveals the basis of his knowledge"; (3) "whether the tipper provides detailed predictive information indicating insider knowledge"; (4) "whether the caller uses a 911 number rather than a non-emergency tip line; and (5) "whether the tipster relays fresh, eyewitness knowledge, rather than stale, second-hand knowledge." *Id.* at 879-80 (citations omitted). "When evaluating the

_____

[6] Talley does not dispute that the 911 tip provided information on potential illegal activity serious enough to justify a stop. "Where state law makes it generally unlawful to carry a concealed weapon without a permit, a tip that a person is carrying a concealed firearm raises a reasonable suspicion of potential criminal activity, even if the tip does not state that the person is carrying the firearm illegally or is about to commit a crime." *Foster v. City of Indio*, 908 F.3d 1204, 1215 (9th Cir. 2018). California law "generally prohibits carrying concealed firearms in public, whether loaded or unloaded." *Peruta v. Cty. of San Diego*, 824 F.3d 919, 925 (9th Cir. 2016) (en banc); *see also* Cal. Penal Code § 25400 (crime of carrying a concealed firearm), § 25850 (crime of carrying a loaded firearm in public). "California officials strictly limit the issuance of concealed carry permits, Cal. Penal Code § 26150(a). . . .  Given the insignificant number of concealed carry permits issued in California, a reasonable officer could conclude that there is a high probability that a person identified in a 911 call as carrying a concealed handgun is violating California's gun laws." *Foster*, 908 F.3d at 1216.
        The Court notes the Supreme Court's decision in *New York State Rifle & Pistol Ass'n v. Bruen*, __ S.Ct. __, 2022 WL 2251305 (June 23, 2022), calls into question the constitutionality of California Penal Code § 26150.  However, "[t]he reasonableness of official suspicion must be measured by what the officers knew before they conducted their search" in November 2021, prior to *Bruen*.  *Florida v. J.L.*, 529 U.S. 266, 271 (2000).

reliability of a tip such as the 911 call here, in which a caller reports information from a third party regarding possible criminal activity, we consider the reliability of both the caller himself and the third party whose tip he conveys." *Id*. at 880.

Several recent Ninth Circuit cases have addressed the reliability of 911 tips. In *Vandergroen*, the Ninth Circuit held that a bar employee's 911 call reporting that patrons had reported seeing a man with a pistol on him was sufficiently reliable to support reasonable suspicion for an investigatory stop. The caller gave his name, said he was calling from the Nica Lounge and provided his position at Nica, and said that three customers had told him that they saw a man with a pistol "on him." *Id*. at 878. The caller said that he could see the man in the back parking lot and that he had just walked into a neighboring bar. The caller described the man as "Latin," "wearing a blue sweater with a Warriors . . . logo," "skinny," and in his early 20s. *Id*. The Ninth Circuit stated that the description "mostly matched" Vandergroen, noting that he was not Latino. *Id*. & n. 3. The caller then reported that the man was running through a parking lot and got into a "Crown Vic" and drove away. Police executed a stop of the man, later identified as Vandergroen, searched the car and found a loaded handgun. *Id*. at 879.

The Ninth Circuit held that the statements by the bar employee were reliable because he provided his name and employment position, "making him a known, and therefore, reliable witness." *Id*. at 880. Further, the employee revealed the basis of his knowledge, "explaining that multiple patrons told him that Vandergroen had a gun on him and offering to ask follow-up questions to the patrons about the exact location of the gun—thereby enhancing the tip's reliability." *Id*. The court also found the fact that the employee "placed his call using an emergency line, which allows calls to be recorded and traced, increased his credibility." *Id*. The court found that, viewed collectively, the statements by the bar's patrons were also reliable, because "the reports were based on fresh, first-hand knowledge" and "the fact that the anonymous tipsters were Nica's patrons who were still at the bar when the 911 call was being made 'narrowed the likely class of informants,' making their reports more reliable." *Id*. (quoting *United States v. Terry-Crespo*, 356 F.3d 1170, 1174 (9th Cir. 2004)).

In contrast, in *United States v. Brown*, 925 F.3d 1150 (9th Cir. 2019), the Ninth Circuit

United States District Court
Northern District of California

1   held that a 911 call from a Seattle YWCA employee reporting that an unidentified resident said

2   they saw someone who had a gun lacked sufficient indicia of reliability to support reasonable

3   suspicion.  In *Brown*, the employee reported that "[o]ne of [her] residents just came in and said

4   they saw someone with a gun," although the employee never saw the gun herself.  *Id.* at 1152.

5   Through the employee, the resident described the man as "a young, black man of medium build

6   with dreadlocks, a camouflage jacket, and red shoes."  *Id.* The 911 dispatcher asked the employee

7   specific questions about what the man was doing with the gun, and the employee answered that

8   the resident had only said that "he has a gun."  *Id.*  The Ninth Circuit noted that "Katowitz [the

9   employee] did not indicate that the resident yelled or shouted, was visibly upset by seeing the gun,

10  or was otherwise alarmed by the gun's presence. Also, there was no indication that the man was

11  loitering at the residence, was known at the YWCA, was harassing or threatening any residents

12  there, or had done anything other than be seen by the resident."  *Id.*

13      The Ninth Circuit held that the 911 tip lacked reliability because although the employee

14  identified herself, the actual source of the tip – the resident – remained anonymous.  *Id.* at 1153.

15  In addition, the tip lacked any predictive information that might have served as an indicia of

16  reliability.  *Id.*  The court also found an "absence of any presumptively unlawful activity," noting

17  that "there was no suggestion that the area was known for high crime or narcotics," and that it is

18  presumptively lawful to carry a gun in Washington state.  *Id.* at 1152-54.[7]  The court found the tip

19  in *Brown* to be "virtually identical" to the anonymous tip found insufficiently reliable in *Florida v.*

20  *J.L.*, 529 U.S. 266, 270-72 (2000) (holding an anonymous tip to a police department that a young

21  black man in a plaid shirt was carrying a gun insufficient to create reasonable suspicion where

---

[7]  In a concurring opinion, Judge Friedland wrote that "the presumptive legality of carrying a concealed firearm in Washington makes this case distinguishable" from *Foster v. City of Indio*, 908 F.3d 1204 (9th Cir. 2018), discussed in footnote 6 *supra. Brown*, 925 F.3d at 1157.  Judge Friedland noted that in *Foster*, "even though the tip did not state that the person was carrying the gun illegally or was about to commit a crime, we held that a reasonable officer 'could have concluded that the tip . . .  provided information on potential illegal activity' because it is presumptively unlawful to carry a concealed weapon without a permit in California, which issues concealed carry permits to only 0.2 percent of its adult population."  *Id.* (quoting *Foster*, 908 F.3d at 1215).  Judge Friedland continued, "In comparison, Washington is not only a 'shall issue state,' as the majority opinion emphasizes; it is also a state in which almost ten percent of citizens have concealed carry permits."  *Id.*

nothing was known about informant and the tip "provided no predictive information and therefore left the police without means to test the informant's knowledge or credibility.").

Talley argues that this case is similar to *Brown* and *J.L.* and that the factors articulated in *Vandergroen* support suppression. First, Talley argues that tipper was anonymous, emphasizing that the caller stated that he wished to be anonymous and never provided his name. Second, Talley contends that the tipper never explicitly stated how he came to know the second-hand information that he was passing on, nor did he identify the eyewitness by name or position. Thus, Talley argues that there are two layers of anonymity, unlike *Vandergroen* where the bar employee provided the tip and stated that the second-hand information came from customers. Third, Talley argues that the tipster did not provide any predictive information, and instead only provided "static" information about general criminality, and Talley notes that when the dispatch operator asked for more details such as where the man was on the second floor or what unit he was attempting to enter, the 911 caller could not provide that information. Fourth, Talley argues the tipster was not providing fresh, contemporaneous knowledge because the caller was relaying secondhand information from an unidentified witness. Talley asserts that the only factor that indicates any reliability – the fact that the call was placed to 911 – is insufficient.

The government disputes Talley's characterization of the 911 call as truly anonymous. The government contends that while the caller did not provide his name, he said that he was calling from the "front desk," referred to "our staff," and said "housekeeping is getting nervous," and thus it was apparent that the caller was affiliated with the Civic Center Inn and that the basis for the eyewitness report was information provided by a staff member. The government emphasizes that the 911 caller was providing contemporaneous information, stating that the man with the gun was still at the inn, and that the police officers arrived within minutes of the 911 call. The government argues that the housekeeper's interactions with the officers once they arrived – immediately flagging them down and repeatedly telling the officers that "the man is in the parking lot" -- independently provided the officers with reasonable suspicion that Talley was armed. The government also argues that Talley was the only individual who met the general description of the individual as he was dressed in all black, wearing white shoes with a black logo, had his head

9

covered, and was approximately 5'9" with a slim build.  Although the information provided by dispatch described the suspect as a white male Latino, the government notes that Talley was wearing a balaclava and thus that it was difficult to see his complexion.  The government also argues that the officers' body cam footage demonstrates that an individual could easily and quickly move from the second floor to the parking lot, and thus the fact that Talley was in the parking lot does not detract from reasonable suspicion.

The Court finds that the circumstances of this case are somewhere between *J.L./Brown* and *Vandergroen*, but closer to *Vandergroen*, and that the government has met its burden to show that the totality of the circumstances demonstrate that the officers had reasonable suspicion to stop and frisk Talley.  As an initial matter, the fact that the caller "placed his call using an emergency line, which allows calls to be recorded and traced, increased his credibility." *Vandergroen*, 964 F.3d at 880.  The Court agrees with the government that the 911 tip here is not entirely anonymous, as the caller stated he was calling from the "front desk" of the inn.  The caller also reported the basis for his information – that someone else saw the man drop a gun and put it back in his pants – and then he stated that "housekeeping here" was getting nervous.  The caller could also be heard conversing with another individual in Spanish during the call, and then he revised the description of the suspect after that discussion.  Thus, the logical inference was that a Spanish-speaking employee had reported to the front desk 911 caller that she had seen a man with a gun at the hotel.  Although the eyewitness remained anonymous, the report was made with fresh knowledge from a person who was still at the inn.  *See id.* (finding 911 tip reliable where "[t]he reports were based on fresh, first-hand knowledge" because bar patrons reported seeing the gun before reporting it to the bartender, and "the fact that the anonymous tipsters were Nica's patrons who were still at the bar when the 911 call was being made 'narrowed the likely class of informants,' making their reports more reliable.").  This is in contrast to *J.L.*, where the anonymous tip was made to a police department, not 911, and "[t]here was no audio recording of the tip or other documentation of the call" and "nothing was known about the anonymous informant." *Terry-Crespo*, 356 F.3d at 1174 (describing and citing *J.L.*).  The Court recognizes, however, that the 911 caller here never provided his name and that he did not explicitly identify the eyewitness who saw the gun.

Here, the caller reported that the man was still at the inn and that he did not want to jeopardize the safety of his staff.  Unlike *Brown* where there was no suggestion of criminal activity or that anyone "was otherwise alarmed by the gun's presence," *Brown*, 925 F.3d at 1152, here a staff member of a hotel was reporting that a man with a gun was currently wandering around the inn and causing concern for the housekeeping staff.  The Court finds it very significant that not only was the 911 caller reporting contemporaneous information, but the officers arrived at the inn within minutes of the call, and thus there was a high likelihood that the man was still on the premises.  *See also Foster*, 908 F.3d at 1215 (holding anonymous 911 tip about a man with a certain description with a gun was reliable because, *inter alia*, the tipster reported contemporaneous information and a police officer responded within minutes of the call).

Even more importantly, almost immediately after the officers arrived, they were flagged down by a woman who – without any prompting – repeatedly and insistently told them that "the man" was in the back parking lot, and she directed them to Talley's location.  Talley argues that the information the woman provided to officers should be discounted because she was standing in in the interior of the hallway and did not have eyes on Talley when she directed the officers his way, and because the woman did not provide a description of Talley or explain who she was or the basis for her information.  While these facts are relevant to the totality of the circumstances, they do not, in the Court's view, mean that the officers could not act upon her information.  The officers knew from the information provided by dispatch that minutes prior to their arrival, "staff" at the Civic Center Inn had reported seeing a man with a gun on the second floor.  Immediately after arriving on the second floor, a woman flagged the officers down, as if she was waiting for the officers.  Unprompted, she told the officers that "the man" was in the back parking lot, and repeatedly corrected the officers when they sought to look elsewhere.  When Officer Conway asked her whether the "man" was "in the building," she replied, "Not right now, but he was opening the door."  Under these circumstances, it was reasonable for the officers to act upon the woman's information, even if they did not explicitly know at the time that she was the eyewitness who had seen the man with the gun.

Once the officers arrived at the walkway overlooking the back parking lot, they saw Talley

United States District Court
Northern District of California

– who generally matched the description of the suspect – rummaging through a purse on the ground. Talley argues that there were other individuals at or around the Civic Center Inn who more closely matched the description of the suspect, such as the man walking in the front parking lot on the Ellis Street side of the inn, the man on the second floor of the inn, or the man seen walking north on Polk Street. As a factual matter, based upon the Court's review of the officers' body-cam footage, the Court agrees with the government's assessment that those individuals did not match the description more closely than Mr. Talley because those individuals were not wearing all black clothing, were not wearing white shoes with a black logo, and were not approximately 5'9" with a slim build. Talley, in contrast, was wearing a black hooded sweatshirt, black pants, white shoes with a black logo, and is 5'10" and has a slim build – close to the description that the 911 dispatcher sent of "WML, 5'9, SLM BLD, BEANIE, BLK JKT, BLK SHIRT, BLK JEANS, WHI SHOES W/ BLK NIKE LOGO."[8] Indeed, Talley was the only individual who was wearing all black with white shoes.

Talley also emphasizes that he did not match the description in two important respects – his race and his location. The dispatcher description stated that the suspect was wearing a beanie; Talley was wearing a balaclava that covered his head and face, thus making his race difficult to determine. Talley also emphasizes that the 911 caller said that the suspect was on the second floor of the hotel, while Talley was in the back parking lot. However, the video footage shows that given the motel-like layout of the inn, it was easy to access the second floor of the inn from the back parking lot. In addition, the woman on the second floor repeatedly directed the officers to the back parking lot, and told the officers that "the man" had been in the building, but was now in the parking lot. Under the totality of the circumstances, the Court finds that the officers had reasonable suspicion to believe that Talley was the subject of the 911 call.

---

[8] Further, even if there were other individuals who matched the description of the suspect, the question for the Court is whether the officers had reasonable suspicion to stop and frisk Talley, not whether the officers could or should have stopped and frisked other individuals (and the officers did stop and frisk the man on the second floor of the inn). For that reason, the Court denies Talley's request for an evidentiary hearing to explore whether there was another man in the back parking lot before the officers who arrived, who may or may not have been the same individual seen walking north on Polk Street in Officer Erb's body-cam footage.

**CONCLUSION**

For the foregoing reasons, the Court DENIES defendant's motion to suppress and DENIES the request for an evidentiary hearing.

**IT IS SO ORDERED**.

Dated: July 4, 2022                    _____

SUSAN ILLSTON
United States District Judge

United States District Court
Northern District of California