UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| USA,<br><br>            Plaintiff,<br><br>    v.<br><br>JAMES EARL TALLEY,<br><br>            Defendant. | Case No. 22-cr-00028-SI-1<br><br>**ORDER ON MOTION TO SUPPRESS**<br><br>Re: Dkt. No. 22 |

Before the Court is defendant James Earl Talley's motion to suppress evidence. Dkt. No. 22. The Court initially denied Mr. Talley's motion to suppress on July 4, 2022. Dkt. No. 29. At a status conference on August 8, 2022, the Court indicated its intent to reconsider the issue and set an evidentiary hearing. Dkt. No. 39. The Court heard evidence on August 22, 2022 and August 29, 2022. Dkt. Nos. 46, 59. The parties have filed supplemental briefing. Dkt. Nos. 62–65. Talley argues that the 911 tip did not contain sufficient indicia of reliability and, in the alternative, any reasonable suspicion of a match dissipated before the search. Dkt. No. 62 at 1.

**BACKGROUND**

On November 14, 2021, Maria Ornelas was working as a housekeeper at the Civic Center Inn. Hearing Transcript (Tr.), Dkt. Nos. 54, 61, at 94. She was cleaning the back parking lot of the hotel when she saw a man with a firearm walking through the lot. Tr. 94. When the man was five feet away from her, he dropped the gun; then he grabbed it and put it in his hoodie pocket. Tr. 95. Ornelas finished cleaning and took out the trash; while she was doing so, the man came up to her and "looked [her] up and down." Tr. 96. Ornelas testified at the evidentiary hearing that the man was wearing black pants, a black sweater, and a hoodie, and that you could only see his eyes. Tr.

95. She could not tell what race he was. Tr. 95.

Ornelas felt nervous and walked to the front desk. Tr. 96. As she left the parking lot, she saw the man jumping to the second floor of the hotel in the back. Tr. 96:18–96:23.

Ornelas arrived at the lobby and saw Christina, who worked at reception, and Christina's son Victor.[1] Tr. 96–97, 99. A customer was outside. Tr. 97. Ornelas warned Christina that there was a person with a weapon and "we needed to be careful." Tr. 96–97. From the front desk they watched security cameras, which showed the man running to Room 225. Tr. 97.

Someone called 911. Tr. 98; Ex. 9 (audio recording of 911 call). Ornelas identified Victor as the speaker on the 911 call but testified that a customer was the one to place the call. Tr. 99–100. The 911 caller said he was at "790 Ellis" Street, the address of Civic Center Inn, and he told the dispatcher "this is the front desk" and "I want to be anonymous." Ex. 9 at 0:07–0:11. The caller reported that "there's a guy with a gun here, he's trying to get into the room" and said the man was "on the second floor." *Id*. at 0:12–0:18. The caller described the man as "wearing blue jeans, white shoes with a little Nike—a little black on them, and a black jacket, and a beanie, and a mask over his face." *Id*. at 0:20–0:34. The dispatcher asked if the man was "white, black, Asian, or Hispanic," and the caller said, "I can't tell because of the mask" and then that he "could be Latino." *Id*. at 0:34 – 0:41. The caller said the man was "about 5'9" and that "he looks slim but the jacket makes him look a little bit bigger." *Id.* at 0:44–0:55.

When the dispatcher asked the 911 caller what type of gun he saw, the 911 caller said "I didn't, somebody else seen it. He dropped it right here from his waistband and picked it back up." *Id.* 1:03–1:15. The 911 caller said the gun was "a handgun" but could not offer any other details about it. *Id.* at 1:16–1:28.

When the dispatcher asked the 911 caller for more information about where the man currently was, such as "which room or which unit number," the 911 caller began speaking Spanish, seemingly to someone other than the dispatcher, and at least one woman can be heard answering in

---

[1] There was no testimony as to the last names of Christina and Victor.

2

Spanish in the background of the recording. *Id.* at 1:29–1:45.[2] The 911 caller then said to the dispatcher, "the housekeeping here [is] getting nervous" and said that the man was "still here in the same place. He's at 790 Ellis. He's on the second floor." *Id.* at 1:45–1:59. With the Spanish speaking woman audible in the background of the recording, the 911 caller then revised the description of the man's clothes, saying: "It's a black shirt. Oh the jeans are black—black jeans, black gloves, beanie, and white shoes." *Id.* at 2:00–2:14. When the dispatcher asked the 911 caller to "have the staff direct them to him so they know who to look for," the 911 caller said "no, we're not going to meet them. We're not going to jeopardize our staff members." *Id.* at 2:16–2:26. The 911 caller became frustrated with the dispatcher and said, "We're not going to jeopardize our staff and get hurt." *Id.* at 2:30–2:34. The dispatcher told the 911 caller that officers were on their way and the call ended. *Id.* at 2:34–2:38.

In response to the 911 call, SFPD officers were immediately dispatched to the Civic Center Inn. The officers received a computer-aided dispatch report stating "RP BEING ADVS BY STAFF THAT MALE ON 2ND FLR HAS A GUN IN HIS WAISTBAND OF PANTS . . . 221 – WML [white male Latino], 5'9, SLM BLD, BEANIE, BLK JKT, BLK SHIRT, BLK JEANS, WHI SHOES W/ BLCK NIKE LOGO." Ex. 14 (Officer Erb's Report).

According to the officers' reports, the first officers arrived at the Civic Center Inn at approximately 10:17 a.m. *Id.* Officer Conway testified that it took approximately a minute to arrive at the Civic Center Inn after getting the call; Officers Erb and Hopkins were already there. Tr. 17–18.

The Civic Center Inn is situated on the corner of Ellis Street and Polk Street, with the front of the inn accessible on Ellis Street and the back of the inn facing Olive Street, which is parallel to Ellis Street. The layout of the Civic Center Inn is like a motel, with rooms on the first floor adjacent to an outdoor parking area on Ellis Street, and the rooms on upper floors accessible by an outdoor

---

[2] Testimony was somewhat inconsistent as to who the Spanish speakers in the background were. Ms. Ornelas testified that she and Christina were speaking in the background, with Ms. Ornelas saying the suspect was wearing a black jacket and Christina saying he was wearing white shoes. Tr. 100. But she also testified that she did not speak "directly" to Victor while he was on the call. Tr. 111. Ms. Ornelas may have been heard in the background even though she was not directing her speech to Victor.

3

1  walkway. At the back of the inn, facing Olive Street, there is another parking lot. When officers
2  arrived at the inn on the Ellis Street side of the hotel, there was a man in the front parking lot wearing
3  a black shirt, grey pants, dark shoes, and a black baseball cap. Ex. 19 at 0:28–43 (Officer Conway's
4  body cam footage); Tr. 19. Officer Conway testified that the man appeared to be a white male
5  Latino wearing a black hoodie and hat and gray jeans. Tr. 41–42. Officers Conway and Silvestri
6  discussed whether he was the suspect and dismissed him, stating that the description was "all black,
7  slim." Ex. 17 at 1:04–1:06 (Officer Silvestri's body cam footage); Tr. 18–20. The officers walked
8  upstairs to the second level. Ex. 19 at 0:45–1:17.

9  Almost immediately after arriving on the second floor, the officers were flagged down by
10 Ornelas, who told them "he is in the parking lot in the back" and who directed the officers to go
11 down a hallway towards the parking lot at the back of the hotel, adjacent to Olive Street. Ex. 19 at
12 1:18-1:31; Tr. 103–04. Officer Conway responded, "In the back? With the cars?", and the woman
13 responded, "Yes." Ex. 19 at 1:31–1:35; Tr. 103–104. Officer Conway then said, "Not in the
14 building. In the parking lot?", and the woman said, "Not right now, but he was opening the door."
15 Ex. 19 at 1:37-1:41. Officer Conway asked what the man looked like, the woman responded by
16 pointing down a hallway towards Olive Street and saying, "This, over there. In the parking lot." *Id.*
17 at 1:41–1:45. Officer Conway pointed to a hotel room on the side of the hallway, and the woman
18 responded, "No, in the parking lot." *Id.* at 1:47–1:49. Officer Conway testified he thought Ornelas
19 appeared "fearful," which supported his belief that the person she was directing him to was the man
20 with the firearm. Tr. 72–73. Ornelas testified that she knew the man was in the parking lot because
21 Christina had been watching the security cameras and told Ornelas that she saw the man jump down.
22 Tr. 104–107. Ornelas testified that she couldn't see the man where she was standing but did see
23 him "when he was bent over going through the bags." Tr. 107.

24 The officers proceeded down the hallway toward the Olive Street parking lot, while Ornelas
25 stayed behind in the interior of the hallway. Ex. 19 at 1:49–1:57. Several officers then converged
26 on the second-floor walkway overlooking the back parking lot and Olive Street. *Id.* Officers saw

4

one man standing on the second-floor walkway; he was Black or Latino,[3] wearing black shorts, a short-sleeved black tee-shirt, black socks with black sandals, and no head covering. Ex. 17 at 2:14–2:27. Officers also saw a second man, later identified as Talley, in the ground floor parking lot below the officers. *Id.* at 2:11. Talley was in an empty parking space between two cars, and he was hunched over and rummaging through a black purse on the ground. *Id.* at 2:10–2:14. Talley was wearing a long-sleeved hooded black sweatshirt, black pants, white shoes with a black logo, gloves, and a black balaclava that covered his face except for the area around his eyes. *Id.* Talley is Black, with a medium to dark complexion.[4] *Id.*; Ex. 2–3 (photographs of Talley).

Officers spoke the man on the second floor, and Sergeant Hopkins frisked him before telling him to go back in his room. Ex. 17 at 1:58–2:31. Meanwhile, Officer Nguyen arrived at the inn after the other officers had, and he proceeded to the second floor walkway overlooking the back parking lot. Officer Nguyen ran up to the second floor and encountered Ornelas. Ex. 18 at 1:04-1:09 (Officer Nguyen's body cam footage). Ornelas pointed down the hallway in the Olive Street direction and said, "There is a guy in the parking lot," and she mentioned "a car." *Id.* at 1:07-1:13. Sergeant Erb, who overheard Nguyen and Ornelas speaking, called out, "Which one, which one?" *Id.*; Ex. 17at 2:06–2:08. Officer Silvestri testified that he was confused and that he could see the man in the parking lot was Black and not a white male Latino. Tr. 157. The officers asked for clarification, and Ornelas responded, "This guy in the parking lot." Ex. 18 at 1:13–1:23. Officer Nguyen ran towards the officers and pointed to Mr. Talley, who was still crouched down in the parking lot, saying, "They're saying it was this guy." *Id.* at 1:09–1:15. Officer Nguyen again said, "They said it was this guy in the parking lot," and Ornelas called out from the interior hallway, "Yeah, yeah." *Id.* at 1:24–30.

Officers Conway and Erb hopped over the second-floor walkway railing and climbed down the parking lot. Tr. 53; Ex. 19 at 2:21–2:30. Officer Conway directed Talley to put his hands on his

---

[3] Defendant's motion describes this man as appearing to be a white Latino, and Officer Hopkins testified that the man was "Latin"; he later testified that the man "looks Latin, but could also be black." Tr. 142. The government asserts, and the video footage supports, that this man was Black. *See* Ex. 17 at 1:99–2:15.

[4] According to the SFPD Incident Report, Talley is 5'10" and weighs 156 pounds. Ex. 12.

United States District Court
Northern District of California

head and to face one of the cars in the parking lot. Ex. 19 at 2:03–2:24. Conway grabbed Talley's wrists and held them behind his back, while Officer Erb frisked Talley. *Id.* at 2:44–2:52. Officer Erb found a loaded handgun with an extended magazine in Talley's front sweatshirt pocket. *Id.* at 3:09–3:25. Officer Conway testified that he noticed Talley was Black as he was "giving instructions" but before Officer Erb frisked him. Tr. 52. The officers arrested Talley, and he was subsequently indicted for one count of violating 18 U.S.C. § 922(g)(1), Felon in Possession of a Firearm and Ammunition.

Following Mr. Talley's arrest the officers arranged to have Officer Linares interview witnesses and do a "cold show" of Mr. Talley. Tr. 55. Officer Linares explained that Ornelas told a blonde woman behind the desk – evidently Christina – to make the 911 call. Tr. 60–61, 63. Officer Linares asked Ornelas to describe the man she saw, and Ornelas said he was wearing all black. Tr. 61. During the cold show Ornelas identified Talley as the man she had seen. Tr. 67.

## LEGAL STANDARD

"The government bears the burden of proving that a warrantless search or seizure falls within an exception to the warrant requirement." *United States v. Job*, 871 F.3d 852, 860 (9th Cir. 2017).

## DISCUSSION

In *Terry v. Ohio*, 392 U.S. 1 (1968), the Supreme Court "held that the police can stop and briefly detain a person for investigative purposes if the officer has a reasonable suspicion supported by articulable facts that criminal activity 'may be afoot,' even if the officer lacks probable cause." *United States v. Sokolow*, 490 U.S. 1, 7 (1989) (quoting *Terry*, 392 U.S. at 30). "Although a mere 'hunch' does not create reasonable suspicion, the level of suspicion the standard requires is 'considerably less than proof of wrongdoing by a preponderance of the evidence,' and 'obviously less' than is necessary for probable cause." *Navarette v. California*, 572 U.S. 393, 397, (2014) (internal citations omitted). "After stopping an individual based on reasonable suspicion, an officer may also conduct a limited pat down, or frisk, if he believes that 'the individual whose suspicious behavior he is investigating at close range is armed and presently dangerous.'" *Job*, 871 F.3d at 861

(quoting *Minnesota v. Dickerson*, 508 U.S. 366, 373 (1993)).

"While a tip such as the 911 call may generate reasonable suspicion, it can only do so when, under the 'totality-of-the-circumstances,' it possesses two features." *United States v. Vandergroen*, 964 F.3d 876, 879 (9th Cir. 2020) (quoting *United States v. Rowland*, 464 F.3d 899, 907 (9th Cir. 2006)). "First, the tip must exhibit sufficient indicia of reliability, and second, it must provide information on potential illegal activity serious enough to justify a stop." *Vandergroen*, 964 F.3d at 879.

Talley contends that the 911 tip did not contain sufficient indicia of reliability.[5] The Supreme Court and the Ninth Circuit have identified the following factors that can demonstrate the reliability of a tip: (1) "whether the tipper is known, rather than anonymous"; (2) "whether the tipper reveals the basis of his knowledge"; (3) "whether the tipper provides detailed predictive information indicating insider knowledge"; (4) "whether the caller uses a 911 number rather than a non-emergency tip line; and (5) "whether the tipster relays fresh, eyewitness knowledge, rather than stale, second-hand knowledge." *Id.* at 879-80 (citations omitted). "When evaluating the reliability of a tip such as the 911 call here, in which a caller reports information from a third party regarding possible criminal activity, we consider the reliability of both the caller himself and the third party whose tip he conveys." *Id.* at 880.

Several recent Ninth Circuit cases have addressed the reliability of 911 tips. In *Vandergroen*,

---

[5] Talley does not dispute that the 911 tip provided information on potential illegal activity serious enough to justify a stop. "Where state law makes it generally unlawful to carry a concealed weapon without a permit, a tip that a person is carrying a concealed firearm raises a reasonable suspicion of potential criminal activity, even if the tip does not state that the person is carrying the firearm illegally or is about to commit a crime." *Foster v. City of Indio*, 908 F.3d 1204, 1215 (9th Cir. 2018). California law "generally prohibits carrying concealed firearms in public, whether loaded or unloaded." *Peruta v. Cty. of San Diego*, 824 F.3d 919, 925 (9th Cir. 2016) (en banc); see also Cal. Penal Code § 25400 (crime of carrying a concealed firearm), § 25850 (crime of carrying a loaded firearm in public). "California officials strictly limit the issuance of concealed carry permits, Cal. Penal Code § 26150(a). . . . Given the insignificant number of concealed carry permits issued in California, a reasonable officer could conclude that there is a high probability that a person identified in a 911 call as carrying a concealed handgun is violating California's gun laws." *Foster*, 908 F.3d at 1216.
The Supreme Court's decision in *New York State Rifle & Pistol Ass'n v. Bruen*, 142 S.Ct. 2111 (June 23, 2022), may call into question the constitutionality of California Penal Code § 26150. However, "[t]he reasonableness of official suspicion must be measured by what the officers knew before they conducted their search" in November 2021, prior to *Bruen*. *Florida v. J.L.*, 529 U.S. 266, 271 (2000).

7

the Ninth Circuit held that a bar employee's 911 call reporting that patrons had reported seeing a man with a pistol on him was sufficiently reliable to support reasonable suspicion for an investigatory stop. The caller gave his name, said he was calling from the Nica Lounge and provided his position at Nica, and said that three customers had told him that they saw a man with a pistol "on him." *Id.* at 878. The caller said that he could see the man in the back parking lot and that he had just walked into a neighboring bar. The caller described the man as "Latin," "wearing a blue sweater with a Warriors . . . logo," "skinny," and in his early 20s. *Id.* The Ninth Circuit stated that the description "mostly matched" Vandergroen, noting that he was not Latino. *Id.* & n. 3. The caller then reported that the man was running through a parking lot and got into a "Crown Vic" and drove away. Police executed a stop of the man, later identified as Vandergroen, searched the car and found a loaded handgun. *Id.* at 879.

The Ninth Circuit held that the statements by the bar employee were reliable because he provided his name and employment position, "making him a known, and therefore, reliable witness." *Id.* at 880. Further, the employee revealed the basis of his knowledge, "explaining that multiple patrons told him that Vandergroen had a gun on him and offering to ask follow-up questions to the patrons about the exact location of the gun—thereby enhancing the tip's reliability." *Id.* The court also found the fact that the employee "placed his call using an emergency line, which allows calls to be recorded and traced, increased his credibility." *Id.* The court found that, viewed collectively, the statements by the bar's patrons were also reliable, because "the reports were based on fresh, first-hand knowledge" and "the fact that the anonymous tipsters were Nica's patrons who were still at the bar when the 911 call was being made 'narrowed the likely class of informants,' making their reports more reliable." *Id.* (quoting *United States v. Terry-Crespo*, 356 F.3d 1170, 1174 (9th Cir. 2004)).

In contrast, in *United States v. Brown*, 925 F.3d 1150 (9th Cir. 2019), the Ninth Circuit held that a 911 call from a Seattle YWCA employee reporting that an unidentified resident said they saw someone who had a gun lacked sufficient indicia of reliability to support reasonable suspicion. In *Brown*, the employee reported that "[o]ne of [her] residents just came in and said they saw someone with a gun," although the employee never saw the gun herself. *Id.* at 1152. Through the employee,

8

the resident described the man as "a young, black man of medium build with dreadlocks, a camouflage jacket, and red shoes." *Id.* The 911 dispatcher asked the employee specific questions about what the man was doing with the gun, and the employee answered that the resident had only said that "he has a gun." *Id.* The Ninth Circuit noted that the employee "did not indicate that the resident yelled or shouted, was visibly upset by seeing the gun, or was otherwise alarmed by the gun's presence. Also, there was no indication that the man was loitering at the residence, was known at the YWCA, was harassing or threatening any residents there, or had done anything other than be seen by the resident." *Id.*

The Ninth Circuit held that the 911 tip lacked reliability because although the employee identified herself, the actual source of the tip – the resident – remained anonymous. *Id.* at 1153. In addition, the tip lacked any predictive information that might have served as indicia of reliability. *Id.* The court also found an "absence of any presumptively unlawful activity," noting that "there was no suggestion that the area was known for high crime or narcotics," and that it is presumptively lawful to carry a gun in Washington state.[6] *Id.* at 1152-54. The court found the tip in *Brown* to be "virtually identical" to the anonymous tip found insufficiently reliable in *Florida v. J.L.*, 529 U.S. 266, 270-72 (2000) (holding an anonymous tip to a police department that a young black man in a plaid shirt was carrying a gun insufficient to create reasonable suspicion where nothing was known about informant and the tip "provided no predictive information and therefore left the police without means to test the informant's knowledge or credibility.").

Talley argues that this case is similar to *Brown* and *J.L.* and that the factors articulated in *Vandergroen* support suppression. Dkt. No. 62 at 2. First, Talley argues that the tipper was anonymous, emphasizing that the caller stated that he wished to be anonymous and never provided

---

[6] In a concurring opinion, Judge Friedland wrote that "the presumptive legality of carrying a concealed firearm in Washington makes this case distinguishable" from *Foster v. City of Indio*, 908 F.3d 1204 (9th Cir. 2018). *Brown*, 925 F.3d at 1157. Judge Friedland noted that in *Foster*, "even though the tip did not state that the person was carrying the gun illegally or was about to commit a crime, we held that a reasonable officer 'could have concluded that the tip . . . provided information on potential illegal activity' because it is presumptively unlawful to carry a concealed weapon without a permit in California, which issues concealed carry permits to only 0.2 percent of its adult population." *Id.* (quoting *Foster*, 908 F.3d at 1215). Judge Friedland continued, "In comparison, Washington is not only a 'shall issue state,' as the majority opinion emphasizes; it is also a state in which almost ten percent of citizens have concealed carry permits." *Id.*

his name. *Id.* at 2. Second, Talley contends that the tipper never explicitly stated how he came to know the second-hand information that he was passing on, nor did he identify the eyewitness by name or position. *Id.* at 4. Thus, Talley argues that there are two layers of anonymity, unlike in *Vandergroen* where the bar employee provided the tip and stated that the second-hand information came from customers. *Id.* Third, Talley argues that the tipster did not provide any predictive information, and instead only provided "static" information about general criminality, and Talley notes that when the dispatch operator asked for more details such as where the man was on the second floor or what unit he was attempting to enter, the 911 caller could not provide that information. *Id.* at 7. Fourth, Talley argues the tipster was not providing fresh, contemporaneous knowledge because the caller was relaying on stale third-hand information from an unidentified witness. *Id.* at 8. Talley asserts that the only factor that indicates any reliability – the fact that the call was placed to 911 – is insufficient. *Id.* at 9.

The government disputes Talley's characterization of the 911 call as truly anonymous. The government contends that while the caller did not provide his name, he said that he was calling from the "front desk," referred to "our staff," and said "housekeeping is getting nervous," and thus it was apparent that the caller was affiliated with the Civic Center Inn and that the basis for the eyewitness report was information provided by a staff member. Dkt. No. 64 at 7. The government emphasizes that the 911 caller was providing contemporaneous information, stating that the man with the gun was still at the inn, and that the police officers arrived within minutes of the 911 call. *Id.* at 6–7, 2. The government argues that the housekeeper's interactions with the officers once they arrived — immediately flagging them down and repeatedly telling the officers that "the man is in the parking lot" — independently provided the officers with reasonable suspicion that Talley was armed. *Id.* at 2. The government also argues that Talley was the only individual who met the general description of the individual as he was dressed in all black, wearing white shoes with a logo, had his head covered, and was approximately 5'9" with a slim build. *Id.* at 11. Although the information provided by dispatch described the suspect as a white male Latino, the government notes that Talley was wearing a balaclava and thus that it was difficult to see his complexion. *Id.* at 11. The government argues that discrepancies in the clothing described – namely, that Talley was wearing

10

1    a black sweatshirt instead of a black jacket, white shoes with a different logo than described, and a
2    black balaclava instead of a black beanie and mask – are "minor differences which do not eliminate
3    reasonable suspicion when considering the totality of the circumstances." *Id.* The government also
4    argues that the officers' body cam footage demonstrates that an individual could easily and quickly
5    move from the second floor to the parking lot, and thus the fact that Talley was in the parking lot
6    does not detract from reasonable suspicion. *Id.* at 12.

7    The Court finds that the circumstances of this case are somewhere between *J.L./Brown* and
8    *Vandergroen*, but closer to *Vandergroen*, and that the government has met its burden to show that
9    the totality of the circumstances demonstrate that the officers had reasonable suspicion to stop and
10   frisk Talley. As an initial matter, the fact that the caller "placed his call using an emergency line,
11   which allows calls to be recorded and traced, increased his credibility." *Vandergroen*, 964 F.3d at
12   880. The Court agrees with the government that the 911 tip here is not entirely anonymous, as Victor
13   stated he was calling from the "front desk" of the inn. Ex. 9. Victor also reported the basis for his
14   information – that someone else saw the man drop a gun and put it back in his pants – and then he
15   stated that "housekeeping here" was getting nervous. *Id.* Victor could also be heard conversing
16   with another individual in Spanish during the call, and then he revised the description of the suspect
17   after that discussion. *Id.* Thus, the logical inference was that a Spanish-speaking employee had
18   reported to the front desk 911 caller that she had seen a man with a gun at the hotel. That Victor
19   did not in fact work at the front desk does not change the analysis because reasonable "suspicion
20   must be measured by what the officers knew before they conducted their search,' not after."
21   *Vandergroen*, 964 F.3d at 880 (quoting *Florida v. J.L.*, 529 U.S. 266, 271 (2000)).

22   Although the eyewitness remained anonymous, the report was made with fresh knowledge
23   from a person who was still at the inn. *See id.* (finding 911 tip reliable where "[t]he reports were
24   based on fresh, first-hand knowledge" because bar patrons reported seeing the gun before reporting
25   it to the bartender, and "the fact that the anonymous tipsters were Nica's patrons who were still at
26   the bar when the 911 call was being made 'narrowed the likely class of informants,' making their
27   reports more reliable."). This is in contrast to *J.L.*, where the anonymous tip was made to a police
28   department, not 911, and "[t]here was no audio recording of the tip or other documentation of the

11

1   call" and "nothing was known about the anonymous informant." *Terry-Crespo*, 356 F.3d at 1174
2   (describing and citing *J.L.*). Talley argues that the information was "stale" and "third-hand" because
3   time passed between Ornelas seeing the man drop his gun and the police arriving, and because
4   Ornelas testified that she was not speaking directly to Victor. Tr. 109–111. But Ornelas could be
5   heard on the phone providing updates to the caller. Ex. 9. Nor was the information stale. Ornelas
6   was with the man in the parking lot for "fifteen minutes" and saw him jump to the second floor as
7   she was rounding the corner to the front desk. Tr. 96–97. Ornelas continued watching the man on
8   security cameras for five minutes. Tr. 98. Victor reported that the man was still at the inn and that
9   he did not want to jeopardize the safety of staff. Unlike *Brown* where there was no suggestion of
10  criminal activity or that anyone "was otherwise alarmed by the gun's presence," *Brown*, 925 F.3d
11  at 1152, here a person who was evidently a staff member of a hotel was reporting that a man with a
12  gun was currently wandering around the inn and causing concern for the housekeeping staff. The
13  Court finds it very significant that not only was the 911 caller reporting that the man was "still here,"
14  but the officers arrived at the inn within minutes of the call, and thus there was a high likelihood
15  that the man was still on the premises. *Navarette v. California*, 572 U.S. 393, 399 (2014); *see also*
16  *Foster*, 908 F.3d at 1215 (holding anonymous 911 tip about a man with a certain description with a
17  gun was reliable because, *inter alia*, the tipster reported contemporaneous information and a police
18  officer responded within minutes of the call).

19  Even more importantly, almost immediately after the officers arrived, they were flagged
20  down Ornelas who – without any prompting – repeatedly and insistently told them that "the man"
21  was in the back parking lot, and she directed them to Talley's location. Talley argues that the
22  information Ornelas provided to officers should be discounted because she was standing in in the
23  interior of the hallway and did not have eyes on Talley when she directed the officers his way, and
24  because Ornelas did not provide a description of Talley or explain who she was or the basis for her
25  information. Dkt. No. 62 at 13. While these facts are relevant to the totality of the circumstances,
26  they do not, in the Court's view, mean that the officers could not act upon her information. The
27  officers knew from the information provided by dispatch that minutes prior to their arrival, "staff"
28  at the Civic Center Inn had reported seeing a man with a gun on the second floor. Immediately after

12

arriving on the second floor, Ornelas flagged the officers down, as if she was waiting for the officers. Unprompted, she told the officers that "the man" was in the back parking lot in "all black," and repeatedly corrected the officers when they sought to look elsewhere. When Officer Conway asked her whether the "man" was "in the building," she replied, "Not right now, but he was opening the door." Under these circumstances, it was reasonable for the officers to act upon her information, even if they did not explicitly know at the time that she was the eyewitness who had seen the man with the gun.

Once the officers arrived at the walkway overlooking the back parking lot, they saw Talley – who generally matched much of the description of the suspect – rummaging through a purse on the ground. Talley argues that there were other individuals at or around the Civic Center Inn who more closely matched the description of the suspect, such as the man walking in the front parking lot on the Ellis Street side of the inn, the man on the second floor of the inn, or the man seen walking north on Polk Street. As a factual matter, based upon the Court's review of the officers' body-cam footage, the Court agrees with the government's assessment that those individuals did not match the description more closely than Mr. Talley because those individuals were not wearing all black clothing, were not wearing white shoes with a logo, and were not approximately 5'9" with a slim build. Talley, in contrast, was wearing a black hooded sweatshirt, black pants, white shoes with a logo, and is 5'10" and has a slim build – close to the description that the 911 dispatcher sent of "WML, 5'9, SLM BLD, BEANIE, BLK JKT, BLK SHIRT, BLK JEANS, WHI SHOES W/ BLK NIKE LOGO."[7] Indeed, Talley was the only individual who was wearing all black with white shoes.

Talley also emphasizes that he did not match the description because of his race, his location, and certain details of his clothes. The dispatcher description stated that the suspect was wearing a beanie and a mask; Talley was wearing a balaclava that covered his head and face, thus making his

---

[7] Further, even if there were other individuals who matched the description of the suspect, the question for the Court is whether the officers had reasonable suspicion to stop and frisk Talley, not whether the officers could or should have stopped and frisked other individuals (and the officers did stop and frisk the man on the second floor of the inn). For that reason, the Court denies Talley's request for an evidentiary hearing to explore whether there was another man in the back parking lot before the officers who arrived, who may or may not have been the same individual seen walking north on Polk Street in Officer Erb's body-cam footage.

13

race difficult to determine. Talley also emphasizes that the 911 caller said that the suspect was on the second floor of the hotel, while Talley was in the back parking lot. However, the video footage shows that given the motel-like layout of the inn, it was easy to access the second floor of the inn from the back parking lot. In addition, the woman on the second floor repeatedly directed the officers to the back parking lot and told the officers that "the man" had been in the building but was now in the parking lot. Nor does the Court find that reasonable suspicion was undermined because of the minor discrepancies that Talley was wearing a balaclava instead of a beanie and hat, white shoes with a red logo instead of a black logo, and a black sweatshirt instead of a black jacket. Under the totality of the circumstances, the Court finds that the officers had reasonable suspicion to believe that Talley was the subject of the 911 call.

Finally, the Court does not find that the officers' consideration of another suspect or their decision to do a "cold show" of the Talley to Ornelas demonstrates a lack of reasonable suspicion at the time Talley was stopped and frisked. Although officers initially stopped and frisked another individual, Ornelas consistently and urgently redirected them to Talley. Ex. 19. Officer Conway testified that he did a cold show "to make sure [he was] being as thorough as possible," not because he doubted that Talley was the person Ornelas had seen. Tr. 62. The Court finds that reasonable suspicion was not dispelled after the officers arrived on the scene because Talley mostly matched the description given and Ornelas urgently directed the officers to Talley.

## CONCLUSION

Defendant's motion to suppress is denied.

**IT IS SO ORDERED**.

Dated: October 25, 2022

_____
SUSAN ILLSTON
United States District Judge